Raymond HOEFEL, Plaintiff, Appellee,

v.

ATLAS TACK CORPORATION,
Defendant, Appellant.

Raymond MAHONEY et al.,
Plaintiffs, Appellees,

v.

GREAT NORTHERN INDUSTRIES,
INC., et al., Defendants, Appellees,

Atlas Tack Corporation, Defendant,
Appellant.

Nos. 77–1517, 77–1519.

United States Court of Appeals,
First Circuit.

Argued May 3, 1978.

Decided Aug. 9, 1978.

Edward R. Lev, Boston, Mass., with whom Joseph Auerbach, Edward Woll, Jr., and Paulette Kessler, Boston, Mass., were on brief, for appellant.

Alan S. Novick, New Bedford, Mass., with whom Novick & Siegel, New Bedford, Mass., was on brief, for appellees.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

Plaintiff-appellees are ten retired employees of defendant-appellant, Atlas Tack Corporation (Atlas). In two separate actions,[1] originally commenced in the Massachusetts Superior Court, they sought to recover certain pension benefits allegedly due them under a pension plan in effect during the period of their employment with Atlas. That plan, having been the product of an agreement between Atlas and one of its collective bargaining units, the International Union, United Automobile, Aeropower and Agricultural Implement Workers of America, UAW and its Local 899 (UAW), provided the basis for federal jurisdiction under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185.[2] On Atlas' motion, the actions were removed to the United States District Court for the District of Massachusetts. There they were consolidated for trial. At the close of plaintiffs' case, the court dismissed their breach of contract claim, but reserved judgment as to whether they could recover under the doctrine of promissory estoppel. At the end of the three day trial, the court held for plaintiffs upon the latter ground and entered a judgment of $102,791, a sum reflecting the amount necessary to purchase life annuity contracts for each of the plaintiffs yielding a monthly payment equal to the pension each plaintiff had earned.

Subsequently, the court filed a written opinion in which it reaffirmed its decision as to promissory estoppel and also held that, upon reconsideration of the applicable law, plaintiffs had a contractual right to their pensions. Atlas appeals, contesting both its liability and the measure of damages. We agree with the district court that plaintiffs

---

1. In the first action, *Mahoney v. Atlas Tack Corp.*, Docket No. 73–1038–F (D.Mass.1973), nine nonunion employees joined as plaintiffs. Four were foremen; the rest were office clerical workers. The second action, *Hoefel v. Atlas Tack Corp.*, Docket No. 75–4526–F (D.Mass.1975), was brought solely by Raymond Hoefel, also a retiree. Hoefel was a member of the Atlas Tack Metal Workers' Union, A.F.L. Federal Labor Union No. 23947 (Tackmakers' Union).

2. The *Mahoney* plaintiffs claim pension rights under the same pension plan that is part of a collective bargaining agreement. Judicial interpretation of their rights therefore could be expected to influence Atlas' administration of the plan even as to the bargaining unit employees. Also, defenses raised by Atlas in suits brought by the *Mahoney* plaintiffs could be foreclosed by collateral estoppel in later suits by bargaining unit members. As a result, the *Mahoney* plaintiffs' interest "are to a large degree inevitably intertwined with union interests." *Smith v. Evening News Ass'n*, 371 U.S. 195, 200, 83 S.Ct. 267, 270, 9 L.Ed.2d 246 (1962). "To exclude these claims from the ambit of § 301 would stultify the congressional policy of having the administration of collective bargaining contracts accomplished under a uniform body of federal substantive law." *Id.* For this reason, § 301 jurisdiction properly extends to the *Mahoney* plaintiffs' claims. This accords with the long-established view that § 301 has substantive content and is "not to be given a narrow reading." *Id.* at 199, 83 S.Ct. at 269; *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 457, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).

have a contractual right to their pensions and affirm on that ground.[3]

In September, 1964, Atlas instituted a pension plan pursuant to a collective bargaining agreement between it and the UAW. Atlas voluntarily extended the plan to cover non-union employees, including the nine plaintiffs in the *Mahoney* action.[4] The plan was also made a part of Atlas' contract with the Tackmakers' Union, thus bringing plaintiff Hoefel under its provisions.

The plan provided that employees who earned a specified number of service credits and reached a specified age would receive upon retirement a monthly pension in an amount determined by the number of credits earned. As originally established, the plan was administered by the Aetna Life Insurance Co. Under its terms, when an employee reached retirement age, Atlas contributed a sum of money sufficient to buy a lifetime annuity contract yielding the monthly pension to which the employee was entitled.

At the time the plan was adopted, each of the plaintiffs was an Atlas employee. Each received a summary of the benefits under the plan. Paragraph 14 of the summary provided:

"The Company fully expects to continue the Plan subject to the terms of its present Pension Agreement with its employees. However, since future changes in conditions cannot be foreseen, the Company necessarily reserves the right to change, suspend or discontinue the Plan at any time. No change, suspension, or discontinuance will adversely affect the pensions already purchased, unless a change is made in the Plan for the purpose of meeting the requirements of the Federal Internal Revenue Code or any other applicable law."

At its inception, the plan provided that employees receive credit for pre-plan service. Because of these credits, the plan began with a large unfunded liability. This deficit increased when benefits were increased in 1966, and increased again as of April 15, 1968, when the group eligible for retirement with pension was enlarged. Another change made in April of 1968 was the conversion of the plan from the Aetna insurance funded plan to a trust funded plan (trusteed plan). Under the new arrangement, Atlas annually contributed an amount sufficient to pay the benefits then due each employee during the year. This change did not purport to affect any employee's entitlement to his pension. It did, however, affect the manner in which Atlas provided for pension payments. Under the insurance plan, when an employee retired, a lifetime annuity contract was purchased for him. Thus, subsequent amendment or discontinuance of the plan could not adversely affect a retiree. Under the trusteed plan, however, benefits came to depend, as the district court described, upon the continuance of the plan and on Atlas' continued solvency.

The change from an insured plan to a trusteed plan was motivated by Atlas' financial difficulties. The costs of the insured plan were substantially higher than the trusteed plan, and Atlas, then suffering economic losses, felt it necessary to reduce the annual amount it was required to pay in benefits. These facts were disclosed to the UAW which then agreed to the change in the plan as to its members. Non-union member employees, such as the plaintiffs,[5] were not informed as to the reasons for the change, nor did they consent to it. In fact, soon thereafter, Atlas through its president misled the non-union employees as to the effect of the change. The evidence supported the district court's finding that

---

**3.** Because of our resolution we have no occasion to rule on the court's alternative ground of estoppel.

**4.** *See* note 1, *supra.*

**5.** While it is true that plaintiff Hoefel, as a member of the Tackmakers' Union, agreed to a collective bargaining agreement which incorporated the plan as it stood in 1969, there is nothing in the record which suggests that Atlas revealed these facts to Hoefel. Thus, it appears that his position was no different from that of the non-union plaintiffs.

"Atlas' President became aware of employee concern about the change, and assured the non-union employees that this had made the plan stronger, and was to their benefit. At the time the President of Atlas gave these assurances, he knew that the trusteed plan was not, in fact more reliable, that it was made necessary by economic losses, and that it made the fate of retired employees subject to the vicissitudes of Atlas' future operations. He not only willfully withheld these facts; he deliberately misrepresented the trust."

In February of 1973, Atlas terminated the pension plan. Prior to that time, but after April, 1968, each of the plaintiffs had retired from Atlas' employment. Each had qualified, upon retirement, for a pension and began to receive monthly payments. In fact, each plaintiff, save one, had qualified for a pension prior to the April, 1968, amendments. Because each had retired after the change from the insurance plan to the trusteed plan, however, no annuity contract was ever purchased for any of the plaintiffs. Upon terminating the plan, Atlas ceased to make payments to the plaintiffs.

The district court credited testimony to the effect that plaintiffs reasonably believed that under the plan, upon qualifying, they would receive a pension for life. It also appears to have credited the testimony from several of the plaintiffs that they continued to work for Atlas after 1967–68 in reliance upon the promise of pension benefits. The court held that Atlas' offer of a pension to its employees became a binding unilateral contract as an employee qualified for a pension by rendering the required number of years of service. Further, it held that the termination clause in the plan did not permit Atlas to discontinue payments to the plaintiffs whose rights had already vested.

■ Through the enactment of the Employment Retirement Income Security Act of 1974, Pub.L. 93–406, 88 Stat. 829, 29 U.S.C. §§ 1001 et seq., Congress manifested its concern to safeguard the pension rights of American workers from the risks similar to those involved here. That statute, while an expression of national policy, has no direct bearing on pension plans terminated prior to 1974 as was Atlas'. Rather, as the parties concede, the nature of the contractual rights of the parties, if any, is governed by state law. Craig v. Bemis Co., 517 F.2d 677, 680 (5th Cir. 1975); Hurd v. Hutnik, 419 F.Supp. 630, 653 (D.N.J.1976).

The threshold question is whether Atlas' voluntary establishment of a pension plan and the acts of employees to qualify for a pension under the plan constitute a contract between Atlas and those employees whose rights have become vested. While noting that the Massachusetts courts have never squarely faced the question, the district court, relying on the trend of modern authority, answered in the affirmative. Since the district court's opinion, the Supreme Judicial Court decided the case of Balkin v. Frank M. Katz, Inc., Mass.Adv.Sh. 2036, 367 N.E.2d 628 (1977), which tends to confirm that answer. There an employee sued to enforce an oral promise by his employer's president to pay him a pension. The Supreme Judicial Court reversed the dismissal below, which was based upon a finding of lack of consideration, holding that where a pension is promised to encourage faithful service, the offer becomes a binding obligation upon completion of such service if rendered in reliance upon the promised benefit. 367 N.E.2d at 630.

■ Balkin reflects the Massachusetts court's acceptance of the modern view that the promise of a pension constitutes an offer which, upon performance of the required service by the employee becomes a binding obligation. As stated in Rochester Corp. v. Rochester, 450 F.2d 118, 120–21 (4th Cir. 1971):

"The pension plan provided that all employees of the defendant, if they remained in the employ of the defendant ten or more years would be entitled, on attaining retirement age, to certain specified pension rights. While unilateral, that offer, when accepted by an employee as evidenced by rendering services for ten

or more years, became 'irrevocable' and such employee acquired 'a right no less contractual than if the plan were expressly bargained for.' By rendering service for the period required under the plan, the employee's rights to the benefits under the plan are 'earned no less than the salary paid to him (the employee) each pay period' and are 'in the nature of delayed compensation for former years of faithful service.' Whether the plan be contributory or noncontributory, the benefits, thus earned, are not gratuities." (Citations omitted.)

*Accord, Hurd v. Hutnik, supra,* 419 F.Supp. at 653–54 (applying New Jersey law); *Hardy v. H. K. Porter, Inc.,* 417 F.Supp. 1175 (E.D.Pa.1976) (applying Pennsylvania law), *aff'd in part, rev'd in part mem.,* 562 F.2d 42 (3d Cir. 1977); *Miller v. Dictaphone Corp.,* 334 F.Supp. 840, 841–42 (D.Ore.1971) (applying Oregon law); *Ehrle v. Bank Bldg. & Equip. Corp. of America,* 530 S.W.2d 482 (Mo.Ct.App.1975); *Stopford v. Boonton Molding Co.,* 56 N.J. 169, 265 A.2d 657 (1970); *Delaware Trust Co. v. Delaware Trust Co.,* 43 Del.Ch. 186, 222 A.3d 320 (1966); *Cantor v. Berkshire Life Ins. Co.,* 171 Ohio St. 405, 171 N.E.2d 518 (1960); *Schofield v. Zion's Co-operative Mercantile Inst.,* 85 Utah 281, 39 P.2d 342, 96 A.L.R. 1083 (1934); *Tilbert v. Eagle Lock Co.,* 116 Conn. 357, 165 A. 205 (1933). *But cf. Boase v. Lee Rubber & Tire Co.,* 437 F.2d 527 (3d Cir. 1970) (applying New York law). *See generally* Annot. 42 A.L.R.2d 462, 46 A.L.R.3d 464.

Even if the establishment of a pension plan by an employer and an employee's subsequent qualification thereunder gives rise, as a general matter, to a vested, enforceable contractual right to the pension earned, Atlas claims that that right can be defeated here because it reserved "the right to change, suspend or discontinue the plan at any time." In urging that we construe this language to permit Atlas to cut off

benefits to employees who had already retired, having qualified for a pension, it cites several cases in which courts have permitted alteration of pension plans over the opposition of employees who had not qualified for a pension.[6] Concededly there is language in some of these cases supporting Atlas' position. However, we agree with the district court that they are not apposite since there the employees had not yet qualified for a pension and thus had not yet acquired any vested contractual rights as have the plaintiffs here.

A number of courts have construed pension plans which reserve to the employer the right to alter or discontinue, similar to the one involved here, as limiting the employer's reserved right to apply only to employees whose pension rights had not, at the time of the change, already vested. Instructive is the opinion of the Ohio Supreme Court in *Cantor v. Berkshire Life Ins. Co., supra.* There an employee sued to recover certain additional retirement benefits. The contested amounts were due under a contract in which the employer had reserved the right to terminate. Noting the importance which retirement benefits have come to assume both to the employee as a form of deferred compensation to provide for old age, and to the employer as a means of obtaining a more stable and productive work force, the court first concluded that pension plans give "rise to contractual rights enforceable by the employee who has complied with all the conditions of the plan." And because, under this contractual theory, an employee acquired a vested right by providing the required consideration, it follows that

". . . even though the employer has reserved the right to amend or terminate the plan, once an employee, who accepted employment under such a plan, has complied with all the conditions entitling him to participate in such plan, his rights become vested and the employer cannot di-

---

**6.** *See Dwyer v. Climatrol Ind., Inc.,* 544 F.2d 307 (7th Cir. 1976), *aff'g,* 403 F.Supp. 683 (E.D. Wis.1975), *cert. denied,* 430 U.S. 932, 97 S.Ct. 1553, 51 L.Ed.2d 776 (1977); *Craig v. Bemis Co., supra; Knoll v. Phoenix Steel Corp.,* 465 F.2d 1128 (3d Cir. 1972); *Finnell v. Cramet, Inc.,* 289 F.2d 409 (6th Cir. 1961); *Sbrogna v. Worcester Stamped Metal Co.,* 354 Mass. 17, 234 N.E.2d 749 (1968); *Bono v. Kramer,* 346 Mass. 355, 191 N.E.2d 760 (1963).

vest the employee of his rights thereunder." 171 N.E.2d at 522.

See Matter of Erie Lackawanna Ry. Co., 548 F.2d 621, 625–27 (6th Cir. 1977); Sheehy v. Seilon, Inc., 10 Ohio St.2d 242, 227 N.E.2d 229 (1967); Ehrle v. Bank Bldg. & Equip. Corp. of America, supra; Stopford v. Boonton Molding Co., supra; Schofield v. Zion's Co-operative Mercantile Inst., supra.

In the face of these authorities, Atlas relies principally upon Boase v. Lee Rubber & Tire Corp., 437 F.2d 527 (3d Cir. 1970). There the Third Circuit was called upon to construe the provisions of a pension plan arising under New York law. The court first noted that it was unclear whether or not the New York courts had yet rejected the discredited "gratuity" theory of pensions. It then went on to hold that where an employer, in "clear and unambiguous" language reserves the right to terminate a pension plan, it can do so even in a manner which deprives retired employees of earned pension benefits. In reaching its conclusion, the court purported to find no countervailing public policy which militated for a different result.

■ While we believe that the employer in Boase brought home to its employees the tenuous nature of the pension rights it promised in a far clearer and more forthright manner than did Atlas, we would decline to follow Boase in any event. We believe that public policy long has required that pension plans be construed, where possible, to avoid the forfeiture of rights which an employee, through years of service, has earned, see, e. g., Neuffer v. Bakery Conf. Workers Int. Union, 113 U.S.App.D.C. 334, 337–338, 307 F.2d 671, 674–75 (1962) (Burger, J., dissenting); Ehrle v. Bank Bldg. &

Equip. Corp. of America, supra; Stopford v. Boonton Molding Co., supra; Cantor v. Brookshire Life Ins. Co., supra; Schofield v. Zion's Co-operative Mercantile Inst., supra; see also Fortune v. National Cash Register Co., Mass.Adv.Sh. 1569, 364 N.E.2d 1251 (1977) (implied covenant of good faith and fair dealing in employment contract violated by employer's termination of at will contract to avoid paying employee's commission); and the concerns motivating Congress to enact ERISA in 1974 confirm our view. See H.Rep.No. 93–807, 93d Cong., 2d Sess., 3 U.S.Code Cong. & Admin. News, pp. 4670, 4676 (1974); S.Rep.No. 93–127, 93d Cong., 2d Sess., 3 U.S. Code Cong. & Admin. News, pp. 4841–42 (1974).

■ The district court found that the plaintiffs reasonably believed that under Atlas' pension plan they would be entitled to a pension for life upon retirement provided that they serve Atlas a specified number of years.[7] While Atlas reserved the right to discontinue the plan, it never explicitly told its employees that discontinuance could cut off payment of pensions already earned. In fact, Atlas told its employees that "no change, suspension or discontinuance will adversely affect the pensions already purchased." That was, of course, true through April, 1968, since up to that time Atlas met its obligation to provide a life pension to its qualified employees by purchasing upon their retirement an annuity contract. Once such a contract was purchased, nothing Atlas might do or fail to do could affect payments. In April of 1968, all but one of the plaintiffs could have retired with a pension prior to Atlas' change to the trusteed plan.[8] The effect of

7. Atlas argues that the court's grant of its motion to dismiss the contractual claim at the end of plaintiffs' case rendered the court's subsequent grant of relief on that claim reversible error. While generally it is not good practice to grant a defendant's rule 41(b) motion and later to reverse that ruling because the defendant may be deprived of the opportunity or incentive to meet plaintiff's case, here, however, Atlas was not prejudiced. In defending against plaintiffs' promissory estoppel claim, it thoroughly explored the plaintiffs' knowledge

of the plan. Moreover, the history of Atlas' negotiations with the UAW would not, we believe, affect the construction of the offer of a pension to these non-union or non-UAW plaintiffs who took no part in the negotiation of the terms of the plan.

8. Plaintiff Karl's eligibility for a pension upon her retirement in 1970 was dependent upon the amendment to the plan made in April, 1968, which, along with changing to the trusteed plan form, also decreased the required number of service credits. That fact does not, we believe,

that change was never explained to the plaintiffs. In fact, as the district court found, the evidence supports the conclusion that the company misled its non-union employees concerning the change. Where the employer establishes the terms of a pension plan, those terms should be construed in favor of the employee. *See, e. g., Ehrle v. Bank Bldg. & Equip. Corp. of America, supra,* 530 S.W.2d at 492; *Stopford v. Boonton Molding Co., supra,* 265 A.2d at 665. That rule of construction seems especially appropriate where the employer has also been guilty of misrepresentation.

 Atlas finally claims that its amendment of the plan from the insured plan to the trusteed plan, and its later complete termination of the plan were justified by economic necessity. We fail to see how Atlas' financial difficulties can excuse its performance of its contractual pension obligations to its former employees. *Cf. Matter of Erie Lackawanna Ry. Co., supra,* 548 F.2d at 627.

We conclude that the district court was correct in holding that the plaintiffs had a contractual right to their pensions and that Atlas breached its duty to pay those pensions when it terminated payments in 1973.

Atlas also challenges the district court's measure of damages. Those damages were computed by adding (1) the value of the pension payments due between the termination of the plan and the date of the judgment to (2) the amount needed to purchase for each plaintiff an individual annuity yielding monthly payments in the amount of the pension to which each plaintiff was entitled, minus (3) a set off for the lump sum payment made by Atlas upon termination of the plan. Atlas apparently objects to the court's use of the cost of an individual annuity in item 2. It would have had the court use an amount, which, if contributed to a large trust fund earning eight per cent, would yield the required monthly sum.

Plaintiffs had a right to their pensions. That right existed whether Atlas met its obligation through a trust fund or individual annuity contracts. Having terminated the trust fund, however, Atlas has left plaintiffs with only the option of investing as individuals. The record supported the district court's skepticism as to the likelihood that small and unsophisticated investors like the plaintiffs could obtain an eight per cent return. We agree that the cost of an individual annuity, competitively priced, is a fair and reasonable measure of damages. *Stopford v. Boonton Molding Co., supra,* 265 A.2d at 668; *see Minnesota Amusement Co. v. Larkin,* 299 F.2d 142, 153 (8th Cir. 1962).

*Affirmed.*

---

render the contract analysis inapplicable in her case. Karl, like each of the other plaintiffs, had qualified for a pension upon retirement. She had in effect acquired a vested right to benefits and began to receive them. When

Atlas sought to terminate the plan in 1973, and in so doing stop payments to its retired employees, it breached its obligation to Karl just as it did to the other plaintiffs with vested pension rights.